# No. 18-498(L)

## No. 18-538(CON)

## United States Court of Appeals for the Second Circuit

MARIA CASTILLO, JAMES COCHRAN, LUIS GOMEZ, BIENBENIDO GUERRA, RICHARD MILLER, CARLO NIEVA, KENJI TAKABAYASHI, NICHOLAI KHAN,

*Plaintiffs – Appellees*,

JONATHAN COHEN, SANDRA FABARA, LUIS LAMBOY, ESTEBAN DEL VALLE, RODRIGO HENTER DE REZENDE, WILLIAM TRAMONTOZZI, JR., THOMAS LUCERO, AKIKO MIYAKAMI, CHRISTIAN CORTES, CARLOS GAME, JAMES ROCCO, STEVEN LEW, FRANCISCO FERNANDEZ,

*Plaintiffs – Counter-Defendants – Appellees*,

KAI NIEDERHAUSEN, RODNEY RODRIGUEZ,

*Plaintiffs*,

v.

G&M REALTY L.P., 22-50 JACKSON AVENUE OWNERS, L.P., 22-52 JACKSON AVENUE LLC, ACD CITIVIEW BUILDINGS, LLC, GERALD WOLKOFF,

*Defendants – Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (BLOCK, J.)

### FINAL FORM REPLY BRIEF FOR APPELLANTS

Meir Feder
James M. Gross
JONES DAY
250 Vesey Street
New York, New York 10281-1047
(212) 326-3939

*Attorneys for Defendants-Appellants*
*G&M Realty L.P., et al.*

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................1

I.     THE DISTRICT COURT ERRED IN FINDING THAT THE
WORKS AT ISSUE SATISFIED VARA'S RECOGNIZED
STATURE REQUIREMENT.......................................................................1

     A.    The District Court Erred At The Threshold By Interpreting
VARA To Require The Preservation Of Inherently Temporary
Works ...........................................................................................2

          1.    VARA Does Not Require Long-Term Preservation Of
Temporary Works ......................................................2

          2.    The Works At Issue Here Were Temporary .............7

     B.    Reversal Is Also Required Because The District Court Applied
A Fundamentally Erroneous Standard For Determining
"Recognized Stature." ................................................................10

          1.    Section 106A(a)(3)(B) Requires That A Work Have
Attained Recognition Of Its Stature Prior To Being
Destroyed ..................................................................10

          2.    The District Court Relied Upon Impermissible Factors
As Bases For Its "Recognized Stature" Determinations.........13

     C.    The Record Is Devoid Of Evidence To Support A Finding Of
Recognized Stature....................................................................17

II.    THE DISTRICT COURT INDEPENDENTLY ERRED WHEN IT
AWARDED THE MAXIMUM AMOUNT OF STATUTORY
DAMAGES FOR WORKS WITH NO ECONOMIC VALUE..................19

III.   REASSIGNMENT TO A DIFFERENT JUDGE ON REMAND IS
APPROPRIATE HERE..............................................................................26

CONCLUSION.................................................................................................27

CERTIFICATE OF COMPLIANCE................................................................28

CERTIFICATE OF SERVICE ........................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alvary v. United States*,
302 F.2d 790 (2d Cir. 1962) ...............................................................18

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) ...........................................................................11

*Braham v. Clancy*,
425 F.3d 177 (2d Cir. 2005) ...............................................................18

*Carter v. Helmsley-Spear, Inc.*,
861 F. Supp. 303 (S.D.N.Y. 1994) ...............................................11, 14

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) .................................................................4

*Disabled in Action of Metropolitan N.Y. v. Hammons*,
202 F.3d 110 (2d Cir. 2000) .................................................................5

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ..............................................................................5

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*,
807 F.2d 1110 (2d Cir. 1986) .............................................................22

*Halo v. Electronics, Inc. v. Pulse Electronics*,
136 S. Ct. 1923 (2016) ..................................................................21, 22

*Kelley v. Chicago Park Dist.*,
635 F.3d 290 (7th Cir. 2011) ................................................................4

*Lubner v. City of Los Angeles*,
45 Cal. App. 4th 525 (1996) ...............................................................19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Martin v. City of Indianapolis*,
   192 F.3d 608 (7th Cir. 1999) ....................................................................17, 18

*Mass. Museum of Contemporary Art Found., Inc. v. Buchel*,
   593 F.3d 38 (1st Cir. 2010)................................................................................4

*N.V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp.*,
   590 F.2d 415 (2d Cir. 1978) ..............................................................................7

*Phillips v. Pembroke Real Estate, Inc.*,
   288 F. Supp. 2d 89 (D. Mass. Oct. 24, 2003) ..................................................19

*Pollara v. Seymour*,
   344 F.3d 265 (2d Cir. 2003) ............................................................................11

*Safeco v. Insurance Co. of America v. Burr*,
   551 U.S. 47 (2007)...........................................................................20, 21, 22, 23

*Twin Peaks Prods. v. Publications Int'l, Ltd.*,
   996 F.2d 1366 (2d Cir. 1993) ..........................................................................22

*United States v. Lumpkin*,
   192 F.3d 280 (2d Cir. 1999) ..............................................................................7

**STATUTES**

17 U.S.C. § 101 .....................................................................................................3

17 U.S.C. § 106A(a)(1)(A) ..................................................................................13

17 U.S.C. § 106A(a)(3)(A) ............................................................................4, 5, 13

17 U.S.C. § 106A(a)(3)(B) ...........................................................................passim

17 U.S.C. § 106A(c)(1).........................................................................................4

17 U.S.C. § 106A(c)(2)..........................................................................................4

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

17 U.S.C. § 504.......................................................................................21

35 U.S.C. § 284.......................................................................................22

**OTHER AUTHORITIES**

5 C.J.S. Appeal and Error § 946 (Dec. 2018) ..................................................17, 18

H.R. Rep. No. 101-514 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915 .................12

Visual Artists Rights Act of 1989: Hearing on H.R. 2690 Before the
Subcomm. on Courts, Intellectual Property, and the Administration
of Justice of the House Comm. on the Judiciary, 101st Cong. 131
(1989) (testimony of Kenneth Snelson)..............................................................5

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN FINDING THAT THE WORKS AT ISSUE SATISFIED VARA'S RECOGNIZED STATURE REQUIREMENT.

The defendants' opening brief established that the district court misconstrued the "recognized stature" standard, 17 U.S.C. § 106A(a)(3)(B), by applying it to transient wall art that was previously unknown even to plaintiffs' own expert. VARA expressly restricts the category of works that must be preserved to those that have been "recognized" as works of "stature." Factors other than such recognition— including after-the-fact opinions of purported artistic quality, or evidence about the site or a work's author generally—cannot satisfy the statute. In particular, defendants established that (1) the district court erred at the threshold by interpreting VARA as imposing liability for the destruction of inherently temporary works like those at issue here, Opening Br. 26–36; (2) the court applied a fundamentally erroneous legal standard, ignoring the express statutory criterion—whether particular works had attained "recogni[tion]"—in favor of impermissible criteria with no basis in the statute, Opening Br. 36–46; and (3) there was no evidence that *any* of the 45 works, let alone all of them, had attained the recognition required by VARA, Opening Br. 46–49.

The defendants further established that, beyond that threshold issue, the district court independently committed reversible error when it applied a

"recognized stature" standard that failed to address the crucial question under VARA: Whether each work had attained sufficient third-party recognition *before* it was painted over. Opening Br. 36–40. And the defendants explained that the district court erred when it otherwise relied upon impermissible and irrelevant factors such as retrospective, post-destruction assessments of artistic merit, Cohen's allocation of wall space to an artist prior to the work's creation, 5Pointz's overall significance as a site, and matters not in evidence to conclude that the 45 works had achieved "recognized stature" under VARA. Opening Br. 41–49.

**A.    The District Court Erred At The Threshold By Interpreting VARA To Require The Preservation Of Inherently Temporary Works.**

   *1.    VARA Does Not Require Long-Term Preservation Of Temporary Works.*

Defendants' opening brief (at 26–31) explained that the district court erred by extending VARA's "recognized stature" protections to temporary works like those at issue in this case. Such short-lived works—between 2002 and 2013, more than 10,000 works were painted and then "covered" by other works at 5Pointz, JA2092–93—satisfy neither the express requirement that a work have attained "recogni[tion]" of its "stature," nor the statutory purpose of preventing the destruction of significant works that would otherwise be preserved. Indeed, if § 106A(a)(3)(B) did extend to such works, the very artworks in this case—almost all of which were created by covering *prior* works indistinguishable from these—would have been unlawful.

2

And such an interpretation would have the perverse effect of stifling the creation of new aerosol art: artists would risk damages every time they covered a prior work, and building owners would be deterred from allowing works on their walls. *See* Opening Br. 29–30.

Plaintiffs have no response to the point that interpreting § 106A(a)(3)(B) as applicable to temporary works would mean their own works were created in violation of VARA. Nor do they address the fact that their actions—in painting over prior works indistinguishable from their own—reflect an understanding that these transient works are *not* entitled to long-term preservation. And the arguments they do make are uniformly unpersuasive.

1. Plaintiffs argue that § 106A(a)(3)(B) requires preservation even of temporary works, because a work can satisfy the definition of a "work of visual art" under VARA and the Copyright Act, *see* 17 U.S.C. § 101, if it is "fixed" for as little as "a matter of minutes or even seconds." Opp. 19. But the broad catch-all definition of "work of visual art" under the Copyright Act is irrelevant to determining the much narrower scope of § 106A(a)(3)(B), which is expressly limited to the small "recognized stature" *subset* of "works of visual art." That a work qualifies as one of visual art says nothing about whether it is within the ambit of § 106A(a)(3)(B). Indeed, the notion that a work fixed for "a matter of minutes or even seconds" can qualify as one of "recognized stature" that must be preserved is nonsensical.

3

For the same reason, VARA's anti-mutilation provision, 17 U.S.C. § 106A(a)(3)(A), offers plaintiffs no support. As defendant's opening brief explained (at 26–27), the anti-mutilation provision aims to prevent modifications that "would be prejudicial to [the artist's] honor or reputation," *id.*—a purpose that applies equally to temporary and permanent works. Congress therefore made that provision broadly applicable to all "work[s] of visual art," while restricting the anti-destruction provision—which aims to prevent the destruction of culturally important works *that would otherwise be preserved*—to significant works that had achieved "recognized stature." That temporary artworks are covered by the former provision says nothing about whether they are within the scope of the narrower "recognized stature" provision.[1] And the same is true of the cases cited by plaintiffs (Opp. 19), none of which addresses the scope of § 106A(a)(3)(B). *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 128 (2d Cir. 2008) (considering when a work is "fixed," as is required to be copyrightable); *Mass. Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38, 52 n.13 (1st Cir. 2010) (expressly stating that § 106A(a)(3)(b) "is not implicated in this case"); *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 298, 303 (7th Cir. 2011) (evaluating only a modification claim under § 106A(a)(3)(a)).

---

[1] Plaintiffs also cite two exemptions from liability contained in VARA, 17 U.S.C. § 106A(c)(1) and (c)(2), neither of which has any bearing on whether a temporary work can achieve "recognized stature." Opp. 19–20.

**2.**   Plaintiffs next claim that the legislative history "makes clear that the purpose of VARA was to cover works that may not originally have been intended to be permanent." Opp. 20.   But none of what plaintiffs call "legislative history"— quotes from artist Kenneth Snelson and witness Arnold Lehman (Opp. 20–21)— comes from members of Congress or the Copyright Office. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (warning against reliance upon legislative materials which could be manipulated by "unrepresentative committee members—or, worse yet, unelected staffers and lobbyists"); *Disabled in Action of Metropolitan N.Y. v. Hammons*, 202 F.3d 110, 126 n.16 (2d Cir. 2000) (affording "little weight" even to statements "by members of Congress other than the sponsors, Committee members and managers of the House and Senate bills"). Moreover, while the Snelson steel sculptures plaintiffs cite were commissioned for a temporary event—the World's Fair—nothing suggests the sculptures themselves were created as temporary works.   To the contrary, Snelson created them as part of "a sequence of different ideas about towers," some of which remain standing.   Visual Artists Rights Act of 1989: Hearing on H.R. 2690 Before the Subcomm. on Courts, Intellectual Property, and the Administration of Justice of the House Comm. on the Judiciary, 101st Cong. 131 (1989) (testimony of Kenneth Snelson).

**3.**   Plaintiffs also contend (Opp. 13, 21) that excluding temporary works would require courts to assess subjective intent and draw difficult lines between "temporary"

5

and "permanent." This case refutes those objections: There is no difficulty—and no need to assess subjective intent—in identifying the inherent temporariness of works painted at a site of "creative destruction" like 5Pointz, which was organized around continual overpainting of older works with newer ones. Opening Br. 28.

4. Plaintiffs do not contest defendants' demonstration that applying § 106A(a)(3)(B) to transitory works like those at 5Pointz will deter artists from creating new aerosol art because every overpainting of a prior work (a central feature of "[g]raffiti etiquette" and 5Pointz generally, Opening Br. 34–35) will risk potential liability for destroying that prior work. Plaintiffs argue (Opp. 23) that under certain circumstances, artists at 5Pointz knew their *own* work was "less likely to be overpainted," but this is a non sequitur: it offers nothing to rebut (or even mitigate) the deterrent effect of attaching potential VARA liability to every overpainting of a prior work at sites like 5Pointz.

As to building owners, plaintiffs claim (Opp. 23–24) any deterrent can be eliminated by executing written waivers, but they fail to address the impracticality of obtaining such waivers for each of thousands of individual artworks—or the likelihood that building owners will eliminate risk by simply refusing permission to use their walls.[2]

---

[2] Plaintiffs properly limit this argument to building owners and do not contend that waivers would offer any workable solution for later artists faced with the risk of liability for covering prior work.

**5.** Finally, plaintiffs argue (Opp. 25–26) that the district court was entitled to rely on expert testimony for the proposition that "works of art can gain recognized stature regardless of their temporary nature." But whether VARA's "recognized stature" provision extends to temporary works is a question of statutory interpretation, and disagreements "on a point of law . . . [are] not a proper subject for witness testimony." *N.V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978); *see also, e.g.*, *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (expert testimony cannot "usurp . . . the role of the trial judge . . . as to the applicable law").

## 2. *The Works At Issue Here Were Temporary.*

Defendants' opening brief established (at 32–36) that almost all of the 45 works at issue were temporary works to which VARA's protections against destruction of "work[s] of recognized stature" do not apply. Specifically, while the district court characterized certain walls at 5Pointz as "long-standing walls" which were "more permanent," SA019, the defendants demonstrated (at 32–34) that no testimony supports that assertion, and that everyone who painted at 5Pointz—including the plaintiffs—understood that *all* works painted there would presumptively be painted over as part of the "creative destruction" process. Opening Br. 34–36.

7

**1.** Plaintiffs insist (Opp. 27–28) that certain walls at 5Pointz were "long-standing walls" which displayed "presumptively permanent" works that would not be painted over, but they can cite nothing in the record that supports that finding, and they identify no works that were actually treated as permanent. Plaintiffs' own testimony establishes precisely the opposite: that it was presumed that anything painted at 5Pointz *would* be painted over. *See* Opening Br. 32–36 & n.8; *see also, e.g.*, JA0872 (Del Valle) ("[T]hat was something that I did understand about the culture of 5Pointz, that stuff just gets painted over."); JA1430–31 (Game) ("The etiquette behind [5Pointz] is, yeah, you can—I know that my painting is going to be painted over, but it has to be with something that's of the same quality if not better."). Indeed, elsewhere in plaintiffs' brief they acknowledge that even works on what they claim were "long-standing walls" were merely "less likely to be overpainted." Opp. 23; *see also* Opp. 48 (acknowledging that "the choice of a favored wall did not guarantee an artwork's survival").

The lone record citation offered by the plaintiffs (Opp. 27–28 (citing SA019–20)) likewise confirms that even works at the most prominent locations at 5Pointz (such as those viewable from the 7 train) were subject to destruction at any time:

> [T]he prime real estate that faces the train were the most sought after spots to paint and those went to more advanced writers. You've got to understand, as well, because you are an advanced writer doesn't mean that you are going to perform on an advanced level. You may just want to blow off steam one afternoon, but that doesn't mean your piece should last a long time.

JA2001 (cited by SA019). That applied to even "long term productions, where people invested time and money"; as Cohen testified, he frequently would "tell [artists] to come back and actually egg them on to do something real better. As the bar got raised, everybody performed better." JA2004 (cited by SA020).

**2.** Plaintiffs' newly invented claim that works on the "favorable walls . . . would not be overpainted" except "if the same artist agreed to try to improve on his work," Opp. 27–28, is created out of whole cloth. Nothing in the plaintiffs' lone record citation—Cohen's testimony that he would encourage artists to "come back and actually egg them on to do something real better," JA2004—supports their new claim that *only* the original author could paint over these works. To the contrary, as the defendants noted in their opening brief (and plaintiffs fail to address), the record overwhelmingly reflects that Cohen routinely authorized other artists to paint over existing works, regardless of where they were located. Opening Br. 32–36 & n.8; *see also, e.g.*, JA0971–72 (Castillo) (Q: "And every one of those, every one of those 30 or 40 [works you painted at 5Pointz], every single one was covered over by *somebody else's* art, correct?" A: "As far as I know, yes." (emphasis added)); JA1337 (Miyakami) (Q: "Have you yourself covered over your own pieces?" A: "Yes." Q: "And you've also painted over other artists; correct?" A: "Yes."). Between 2002 and 2013, more than 10,000 works were overpainted at 5Pointz,

JA2092–93, and there was no testimony that this was in any way limited to overpainting by the original artists.

**3.** Finally, plaintiffs' claim (Opp. 28) that the district court correctly deemed the works—including as many as 14 newly painted on walls already approved by authorities for destruction, Opening Br. 12 n.3—to be permanent because "the remaining paintings on the long-standing wall were deemed to be meritorious," makes no sense. Whether a work is "meritorious" has no bearing on whether it is permanent or temporary. Plaintiffs' own testimony established that thousands of presumably "meritorious" works at 5Pointz were nonetheless temporary and were painted over as a matter of course in the "creative destruction" process.

In sum, plaintiffs' claim that all 45 works at issue here were "permanent," and would not have been destroyed but for defendants' actions, is flatly contrary to the record. VARA's requirement to preserve significant works of "recognized stature" had no proper application to these transient works.

**B.** **Reversal Is Also Required Because The District Court Applied A Fundamentally Erroneous Standard For Determining "Recognized Stature."**

> *1.* *Section 106A(a)(3)(B) Requires That A Work Have Attained Recognition Of Its Stature Prior To Being Destroyed.*

Defendants' opening brief established that even if § 106A(a)(3)(B) could be applied to temporary works, the district court fundamentally misconstrued the statute's "recognized stature" requirement. Opening Br. 36–45. The court erred by

failing to focus on, or require plaintiffs to satisfy, the critical statutory criterion: whether each work individually attained sufficient third-party recognition before it was destroyed. Opening Br. 36–40. That requirement is apparent from the "plain language of the provision," *Pollara v. Seymour*, 344 F.3d 265, 271 (2d Cir. 2003) (Gleeson, J., concurring [3] ); indeed, Congress consciously chose the phrase "recognized stature" (which focuses on a work's established reputation) instead of borrowing from existing state statutes which required "recognized quality" (which focuses on artistic merit). Opening Br. 37–38. That choice is consistent with the settled principle that courts are ill-equipped to assess artistic quality, *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251–52 (1903), and is confirmed by the legislative history underlying VARA. Opening Br. 38–40. And requiring evidence of *pre*-destruction recognition is also necessary to prevent the chilling effect that would result from allowing liability to turn unpredictably on subjective post-destruction retrospective assessments. Opening Br. 40.

**1.** Plaintiffs rely on the lower court's statement in *Carter I* that "VARA does not delineate *when* a work must attain 'recognized stature.'" Opp. 31 (quoting *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 325 n.12 (S.D.N.Y. 1994)). But that statement was not adopted by this Court on appeal, and it is demonstrably incorrect. The statute requires "destruction of a work of recognized stature," not

---

[3] The other two judges on the *Pollara* panel did not reach this issue. *See* 344 F.3d at 268.

destruction of a work that may later *acquire* recognized stature. A defendant that destroys a work that has not yet attained such stature plainly has not "destroyed a work of recognized stature."

**2.** Plaintiffs downplay Congress' choice of "recognized stature" over "recognized quality," speculating that it may have been "intended to embrace the idea that a work of art may acquire historical or societal importance that goes beyond its purely aesthetic nature," as, for example, "the only surviving work of its kind" or as a work "created under conditions of historical significance." Opp. 33. That is precisely the point: Congress chose language that requires a focus on recognition of a work's significance, and rejected a standard that would turn on subjective judgments about "quality." The district court's reliance on after-the-fact opinions about artistic quality, and its disregard for whether the works had achieved pre-destruction recognition, was necessarily erroneous.

**3.** Plaintiffs object to defendants' argument that the House Judiciary Committee itself described the "recognized stature" requirement as turning on "pre-existing" status (Opening Br. 39), contending that the Committee was focused on the status of the artist rather than the work. Opp. 32–33. But the Committee expressly said the requirement would produce competing evidence "over whether a particular *work* had a recognized stature." H.R. Rep. No. 101-514, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6925 (emphasis added). And in any event the

12

key point, which plaintiffs' argument does not address, is that the Committee regarded "recognized stature" as requiring "pre-existing" stature.

**4.**  Equally unavailing are plaintiffs' attempts to rebut the argument that if "recognized stature" did *not* require pre-destruction recognition, it would be unfairly unpredictable and chill legitimate conduct.  Opp. 36–37.  Plaintiffs argue that a building owner also may not know in advance whether it is violating VARA's mutilation provision, which prohibits only modifications "prejudicial to [the artist's] reputation," 17 U.S.C. § 106A(a)(1)(A).[4]  Opp. 36.  But that standard is not nearly so unpredictable as one that would turn on an expert's years-later testimony that a work was of high quality.  In addition, the requirements of the two provisions are fundamentally different:  only the destruction provision contains a requirement—"recognized stature"—whose natural meaning requires objective evidence of before-the-fact "recognition."

> 2.  *The District Court Relied Upon Impermissible Factors As Bases For Its "Recognized Stature" Determinations.*

Defendants' opening brief established that in addition to ignoring the essential statutory requirement, the district court also erred by relying on irrelevant and impermissible factors.  Opening Br. 41–46.  The court relied heavily on post-

---

[4] Plaintiffs also brought claims under § 106A(a)(3)(A) for modification of their works.  The district court rejected this claim, concluding that whether the plaintiffs' reputation had been impacted by any modification was "academic" because it found that the plaintiffs had not established they suffered any actual damages.  SA036.  Plaintiffs did not appeal that ruling.

destruction opinions of the works' artistic merit by plaintiffs' expert, Renee Vara, which bear only on whether a work is of "recognized quality," not "recognized stature." *Id.* at 41–42. Section 106A(a)(3)(B) turns only on the latter. The court's reliance on Cohen's purported "selection" of many of the 45 works (10 of which were his own) for purported "longstanding walls" was also erroneous: Cohen's assignment of wall space occurred *before* a work was created, and in any event many of the works were either nearly brand new, or lasted slightly longer only because of their personal significance to Cohen or their locations, rather than their "stature." *Id.* at 43–45. And the court could not properly rely on the significance of 5Pointz as a whole, because § 106A(a)(1)(B) requires that particular "works," not sites, have achieved the necessary recognition. *Id.* at 45–46. These errors thoroughly infected the district court's "recognized stature" findings.

**1.** Plaintiffs admit that "the personal aesthetic judgment of the court should not determine whether a work has stature," Opp. 35, but seek to excuse the district court's reliance on post-destruction opinions of quality, such as those of Ms. Vara, on the ground that her views on artistic merit go to her credibility. *Id.* Plaintiffs' sole citation for this odd notion provides no support: in *Carter I* an expert's rejection of all contemporary art as "intrinsically meritless" made him incredible as an expert witness on contemporary art standards. 861 F. Supp. at 326 n.13. That is not remotely analogous to anything in this case. In any event, Judge Block did not rely

on Ms. Vara's merit assessments for credibility purposes, but on the merits, crediting her post-destruction "detailed findings as to the skill and craftsmanship of each of the 49 works" as evidence of recognized stature. SA031. These are precisely the sorts of "personal aesthetic judgment[s]" plaintiffs concede cannot establish "recognized stature."

**2.** Plaintiffs' claim that Cohen's "selection" of the works is probative of recognized stature is wrong in multiple ways. Opp. 40–41, 47–49. First, Cohen assigned wall space to an artist *before* works were painted, so his "selection" was at best a recognition of an artist, not of the particular work. Plaintiffs' new claim (Opp. 27) that Cohen "required an elaborate procedure involving the presentation of a portfolio and a sketch or plan before approving the painting work to start" has no basis in the record. The testimony plaintiffs cite establishes the opposite: Cohen testified that only in some "instances, the artist would come with a sketch or an idea or references," JA2004, thereby making clear that most of the time there was no sketch, and that none was required. Nor did Cohen ever testify that a portfolio was required. Second, they identify no legal basis for their assertion (Opp. 47) that Cohen's "selection" of his own works can establish that they were "recognized" within the meaning of VARA. The phrase "recognized stature" contemplates evidence of third-party recognition. *See* Opening Br. 37–38. Third, selection by Cohen could hardly establish that a work had "recognized stature" prohibiting its

destruction when his consistent conduct—directing the overpainting of thousands of works he had authorized for the very same walls—demonstrated that he did not view the works he authorized as significant enough to merit preservation.[5]

**3.** Plaintiffs defend the district court's reliance on recognition of 5Pointz as a site because "[o]ne of the factors in considering the importance of a work of art is its provenance."  Opp. 39.  Whatever the relevance of "provenance" to the express statutory requirement that the particular *work* have recognized stature—a relevance that is far from self-evident—it has no application to 5Pointz, which was popular precisely because of the ever-changing panoply of works created and destroyed there on a regular basis, and not because of any permanent collection of significant works. *E.g.*, JA1894 (Miyakami) (Q: "Is it fair to say that the artwork at 5Pointz keeps changing?"  A:  "Yes.  That's how [Cohen] was curating 5Pointz.  I love it.  I love how he does."); JA2216–17 (Ms. Vara's testimony that she walked by 5Pointz on a daily basis before the whitewash, but was familiar with "[z]ero" of the 45 works before this litigation).

---

[5] Plaintiffs make much of the claim that "Wolkoff personally commissioned Cohen" to bring art to 5Pointz.  Opp. 36.  But Mr. Wolkoff did not "commission" Cohen to procure artworks; rather, as the district court noted, "Cohen approached Wolkoff in 2002 to become the curator of the works that would be permitted to be painted on the wall," and "Wolkoff agreed."  JA0779.  And unless plaintiffs now contend that all of the thousands of works Cohen authorized (and then painted over) were of "recognized stature," that authorization establishes little.

16

**C.      The Record Is Devoid Of Evidence To Support A Finding Of Recognized Stature.**

Finally, defendants' opening brief established that under the correct legal standard, there was no basis in the record upon which a factfinder could reasonably conclude that any of the works achieved recognized stature.  Opening Br. 46–49.  Plaintiffs were conspicuously unable to adduce any testimony regarding the pre-destruction stature of any individual works, and their own expert witness acknowledged that despite walking past 5Pointz daily she had no familiarity with any of the works prior to this litigation.  Opening Br. 46 (citing JA2216–17).  Further, in the 1,200 pages of "folios" plaintiffs submitted, only a small fraction (51 pages) contained third-party evidence of any work at issue here, and all but 4 of those were merely a single picture without any commentary.  Opening Br. 47–48.  The record here is devoid of the types of evidence relied upon by other courts when making a recognized stature finding.  Opening Br. 46–49; *cf. Martin v. City of Indianapolis*, 192 F.3d 608, 612 (7th Cir. 1999).

Plaintiffs do not seriously dispute that the record contains almost no work-specific evidence of recognized stature, and they concede that some of the materials relied upon by the district court and Ms. Vara—which in any event provided no cognizable evidence of "recognized stature"—were "not individually entered into evidence."  Opp. 46, 50.  Such materials are not evidence at all; it is hornbook law that a factual determination must be supported by materials in the record.  *E.g.*, 5

17

C.J.S. Appeal and Error § 946 (Dec. 2018); *see also Braham v. Clancy*, 425 F.3d 177, 184 (2d Cir. 2005) ("As a general matter, we will not consider material not included in the record on appeal."); *Alvary v. United States*, 302 F.2d 790, 794 (2d Cir. 1962) (reversing district court's ruling predicated on extra-record materials).

Plaintiffs seek to justify their inability to produce evidence of pre-destruction recognition by arguing that "[g]iven the nature of aerosol art, traditional academic databases are unlikely to contain any scholarly articles on individual artists, much less particular artworks," and thus that the more appropriate "evidence of societal recognition . . . is to be found in social media." Opp. 50–51. But even if this were true, plaintiffs failed to identify social media evidence, either. The record contains only four social media posts by a third party regarding any of the works, three of which are sparse blog posts that do not even identify the subject work's correct title, and an Instagram post of Khan's *Dos Equis Man* posted three years *after* the whitewashing occurred. Opening Br. 47–48 & n.14.

In the absence of any work-specific evidence, plaintiffs argue that evidence not specific to the works—such as the reputation of the artist or popularity of a site where a work is located—can establish "recognized stature." Opp. 42–45, 49–52. Those arguments find no support in VARA, which protects works *of* recognized stature, not works *by* artists of recognized stature or at sites of stature. None of the cases cited by plaintiffs holds otherwise. *See Martin*, 192 F.3d at 610, 612 (Opp. 42)

("recognized stature" finding based on third-party evidence of work's recognition, not artist's background); *Phillips v. Pembroke Real Estate, Inc.*, 288 F. Supp. 2d 89, 103 (D. Mass. Oct. 24, 2003) (Opp. 42) (evaluating "recognized quality" under state law, not "recognized stature"); *Lubner v. City of Los Angeles*, 45 Cal. App. 4th 525, 531 (1996) (Opp. 43) (assuming that works were of recognized stature for purpose of preemption analysis). Likewise, VARA does not impose liability for the destruction of a "site," but only for the destruction of works of "recognized stature." Evidence that 5Pointz, as whole, possessed cultural significance cannot substitute for evidence that specific works achieved recognized stature, as required by § 106A(a)(1)(B).

Accordingly, there is no evidentiary basis for concluding that *any* of the works at issue in this case achieved "recognized stature," and thus were protected by VARA. Judgment should therefore be entered for the defendants.

## II. THE DISTRICT COURT INDEPENDENTLY ERRED WHEN IT AWARDED THE MAXIMUM AMOUNT OF STATUTORY DAMAGES FOR WORKS WITH NO ECONOMIC VALUE.

Defendants' brief next explained (at 50–60) that, at a minimum, the district court erred when it awarded the $6.75 million in statutory damages for the destruction of art the court itself recognized had no "provable market value," SA038. The court erroneously refused to apply Supreme Court case law holding that a defendant cannot be deemed to have willfully violated a statute when he could

reasonably have thought the conduct at issue was lawful.  Opening Br. 50–53.  The court also erred by finding willfulness—and imposing the maximum amount of statutory damages—when at the time of the whitewashing no claims had even been asserted with respect to 28 of the 45 works at issue here.  *Id.* at 53.  In addition, the justifications offered by the court for its willfulness determination are contradicted by the record, *id*. at 53–56, and the massive statutory damages award here otherwise constitutes an abuse of discretion and is so disproportionate to the underlying offense that it violates the defendants' constitutional rights, *id*. at 57–60.

 **1.**  Plaintiffs offer no justification for the district court's finding of willfulness and imposition of massive statutory damages with respect to the 28 works as to which no claim of entitlement to VARA protection had even been asserted at the time of the whitewashing (and of the purportedly deceptive testimony).  Even assuming *arguendo* the willfulness finding and damages could be justified as to the 17 works for which a claim *had* been asserted, the award of $150,000 for each of these 28 works was a plainly unmerited windfall to plaintiffs and a groundless punishment of the defendants.

 **2.**  The plaintiffs contend that willfulness requires only "knowledge or reckless disregard for *possibility* of a violation," rather than conduct that is "clearly unlawful under established law."  Opp. 52, 57 (emphasis added).  They cite cases from this Court decided more than a decade before *Safeco v. Insurance Co. of*

*America v. Burr*, 551 U.S. 47 (2007), and argue that the Supreme Court's recent decision in *Halo v. Electronics, Inc. v. Pulse Electronics*, 136 S. Ct. 1923 (2016), rejected the contention that *Safeco* restricts willfulness to violations of clearly established law. Opp. 52–54, 58. Plaintiffs further argue that Mr. Wolkoff cannot claim to have thought VARA inapplicable to the works he whitewashed because he was represented by counsel at the time. Opp. 59–60.

But defendants do not contend, as plaintiffs suggest (Opp. 54), that "willfulness" under 17 U.S.C. § 504 can only apply to "knowing violations of the law"; *Safeco* itself establishes that willfulness extends to "reckless" violations. *See* Opening Br. 50–53. But under *Safeco* a defendant cannot be deemed to have recklessly violated a statute where it is not clearly established—by appellate authority, binding regulatory authority, or "pellucid" statutory text—that the statute forbids the conduct. 551 U.S. at 70. Here, whether temporary works like those at 5Pointz are protected from destruction by VARA is a question the district court acknowledged was one of first impression. SA005. Under *Safeco*, "[w]here, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." 551 U.S. at 70 n.20. Because it was far from clearly established that

21

§ 106A(a)(3)(B had any application to works like those at 5Pointz, the district court erred in holding that defendants willfully violated the statute.[6]  Opening Br. 50–53.

**3.**  Further, nothing in *Halo Electronics* says otherwise.  That case did not involve a "willfulness" statute, as plaintiffs suggest; rather, it considered judicial discretion to award heightened damages in patent infringement suits under 35 U.S.C. § 284, which contains no mention of "willfulness."  *Halo Electronics*, 136 S. Ct. at 1931.  When evaluating that discretionary standard, the Court clarified that enhanced patent damages have traditionally been reserved for conduct "variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate," *id.* at 1932, and therefore rejected a lower court's test that permitted bad-faith infringers to avoid damages through creative legal defenses crafted post-hoc, *id.* at 1932–33.  Indeed, the Court confirmed that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct"—a conclusion it bolstered with its decision in *Safeco* that "the defendant had not recklessly violated the Fair Credit Reporting Act because the

---

[6] The pre-*Safeco* cases cited by plaintiffs do not hold otherwise.  Opp. 52–54.  In both, the court concluded that the record unequivocally established that the defendant knew its actions were unlawful.  *See Twin Peaks Prods. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993) (defendant conceded "it knew of the copyrights" and court deemed its claims that "it believed its actions . . . were lawful" to be "incredible in light of [the defendant's] substantial litigation history"); *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir. 1986) (defendant's "own internal memoranda revealed" that defendant knew its actions were unlawful). That is not the case here.  Opening Br. 50–56.

defendant's interpretation had 'a foundation in the statutory text' and the defendant lacked 'the benefit of guidance from the court of appeals or the Federal Trade Commission' that 'might have warned it away from the view it took.'"  *Id.* at 1933 (quoting *Safeco*, 551 U.S. at 69–70).[7]

4.  The district court's willfulness findings do not pass muster under even the plaintiffs' erroneous standard.  To the extent Mr. Wolkoff knew of the "potential" for a VARA violation, that awareness could not have arisen until after the district court issued its written preliminary injunction opinion, which marked the first time a court suggested VARA's destruction provision protected temporary works like those at 5Pointz.[8]  Opening Br. 53–54.  The whitewashing occurred before that date.  Opening Br. 53–54.  Moreover, even if the mere filing of a Complaint can put a defendant on notice of a potential VARA violation (a dubious proposition for which plaintiffs identify no authority), at the time the whitewashing occurred, suit had been brought on only 17 of the 45 works—a point made by the defendants (at 53) but ignored by the plaintiffs.

---

[7] Plaintiffs also accuse defendants of advocating for an insurmountable standard that requires an appellate ruling "apply[ing] the law to the very scenario at issue" for willfulness to be found.  Opp. 57.  Not so.  As the defendants explained, *Safeco* requires the violation of "clearly established *law*" (a standard familiar from qualified immunity cases, and one not satisfied here), not the existence of an identical prior lawsuit.  Opening Br. 50–53.

[8] In any event, the preliminary injunction opinion warned only of "significant monetary damages" predicated on the "value [] invariably reflected in the money they command in the marketplace," JA0794, not an award based on whether Mr. Wolkoff waited 10 months before he destroyed the works, SA050.

**5.** Nor can plaintiffs justify the district court's ruling by importing facts found nowhere in the record. Plaintiffs accuse Mr. Wolkoff of having "consciously weighed the risk of violating VARA against the risk of jeopardizing his multimillion dollar luxury condo project," but support that assertion with a cite to an early part of the district court's opinion which merely recites the text of VARA. Opp. 61 (citing SA007). As defendants' opening brief explained, there is *no* evidence that the defendants saved expenses or earned profits by whitewashing the works (or even that the plaintiffs suffered any actual damages), which highlights the disproportionate nature of the award, in violation of the defendants' constitutional rights.[9] Opening Br. 57–58, 60. Plaintiffs likewise claim that because Mr. Wolkoff allegedly used cheap paint at and was present for the whitewashing, his "intent" justified a maximum statutory damages award. Opp. 62. That is not the proper legal inquiry: the question is whether the defendant intentionally violated the statute by whitewashing the works, not whether he intentionally painted over the works. Finally, the plaintiffs repeat the district court's finding in its post-trial opinion—in contradiction of its earlier finding, SA015—that Mr. Wolkoff "deceived" the court

---

[9] Plaintiffs also claim that the artists "suffered significant loss of artistic opportunities" due to the whitewashing and lost "fame and opportunities." Opp. 64–65. Nothing in the record supports those assertions. Likewise, plaintiffs fault Mr. Wolkoff for not sharing in licensing fees purportedly obtained by granting 5Pointz access to filmmakers, but cite no record evidence for this claim, nor do they identify any legal basis for why Mr. Wolkoff was obligated to share profits he generated through his property (which he allowed others to paint on for free at their request). Opp. 64–65.

regarding the demolition schedule of the building. Opp. 63–65. As defendants explained at length in their opening brief, there is no evidence that Mr. Wolkoff misled the Court at all, which defendants could have confirmed had they received notice that his four-and-a-half year old testimony was in question, and an opportunity to present evidence on that topic. Opening Br. 54–56. Plaintiffs offer no response to this demonstration.

**6.** Plaintiffs also fail to address defendants' arguments that the district court injected impermissible factors into its willfulness analysis. In particular, defendants argued that a "willfulness" finding is not the proper means for, in effect, sanctioning a witness for purportedly misleading testimony, or for punishing a defendant for not affording the artists additional space to paint at his new property. Opening Br. 60–61. Plaintiffs do not respond to these points. The defendants also pointed out that the majority of the works were not even part of the lawsuit at the time of the allegedly misleading testimony, making a willfulness penalty as to those works particularly inappropriate and illogical. Opening Br. 53. Plaintiffs offer no response to this, either.

**7.** Finally, plaintiffs' contention (Opp. 65) that the Constitution imposes no limits on statutory damages is incorrect, particularly where, as here, the district court found that plaintiffs suffered no economic injury. In these circumstances, the

statutory damages award is indistinguishable from punitive damages, as to which constitutional limits are well established. *See* Opening Br. 60.

## III. REASSIGNMENT TO A DIFFERENT JUDGE ON REMAND IS APPROPRIATE HERE.

Finally, the defendants' opening brief established that in the event of a remand, reassignment is appropriate because a number of the district court's actions could lead a reasonable observer to question the court's impartiality. Opening Br. 61–64. Plaintiffs principally respond by arguing that if the defendants were concerned about partiality, they should not have consented to a bench trial. However, a party's waiver of jury rights does not permanently forfeit its right to raise an appearance of partiality. Moreover, the clearest examples of animus—the district court's imposition of massive damages even as to the 28 works as to which no claim had been asserted at the time of the whitewashing, SA041; its *sua sponte* reversal of its prior finding that Mr. Wolkoff testified truthfully in its effort to justify its willfulness finding, SA116 n.11; its statements that Mr. Wolkoff was "insolen[t]," SA049, and that his conduct "stuck in my craw," SA116; and its complaints that Mr. Wolkoff was a "difficult witness . . . prone to tangents and non-responsive answers," SA015—occurred in opinions issued *after* the trial. Opening Br. 63–64. Thus, reassignment to a different judge remains warranted in any remand here.

## CONCLUSION

For the foregoing reasons, the defendants respectfully request that this Court reverse the district court and remand this case with instructions to enter judgment in the defendants' favor.  In the alternative, the defendants respectfully request that this Court vacate the district court's order, re-assign this case to a different district court judge, and then remand this matter to that judge for additional proceedings consistent with this Court's Order.

Dated:     February 8, 2019
           New York, New York

                                    By: /s/ Meir Feder
                                    Meir Feder
                                    James M. Gross
                                    JONES DAY
                                    250 Vesey Street
                                    New York, NY 10281-1047
                                    Telephone: (212) 326-3939
                                    Facsimile: (212) 755-7306

                                    *Attorneys for Defendants-*
                                    *Appellants*

## CERTIFICATE OF COMPLIANCE

This reply brief complies with the type-volume limitation in Second Circuit Local Rule 32.1(a)(4)(B). It contains 6,616 words as counted by the word-processing system used to prepare the brief, exclusive of the parts of the brief exempted from the type-volume limitation by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This reply brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font in the body text, and 12-point Times New Roman font in the footnote text.

Dated: February 8, 2019
     New York, New York

*/s/ Meir Feder*
Meir Feder

## CERTIFICATE OF SERVICE

I certify that on February 8, 2019, a true and correct copy of the foregoing

FINAL FORM REPLY BRIEF FOR APPELLANTS was served upon counsel of

record for all parties to this appeal through the Court's CM/ECF system.


Dated: February 8, 2019          */s/ Meir Feder*
      New York, New York      Meir Feder